UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DON LOMBARDO,<br>　　　*Plaintiff*,<br><br>　　　*v.*<br><br>R.L. YOUNG, INC. d/b/a YOUNG & ASSOCIATES,<br>　　　*Defendant.* | Civil No. 3:18cv188 (JBA)<br><br>June 11, 2020 |
| R.L. YOUNG, INC. d/b/a YOUNG & ASSOCIATES,<br>　　　*Counterclaim Plaintiff*,<br><br>　　　*v.*<br><br>DON LOMBARDO and DND CONSTRUCTION SERVICES, LLC,<br>　　　*Counterclaim Defendants.* | |

**RULING GRANTING CROSS MOTIONS FOR SUMMARY JUDGMENT**

The adverse parties in this diversity action bring two distinct summary judgment cross motions. Plaintiff and Counterclaim Defendant Don Lombardo raises multiple contract claims and related equitable claims against Young & Associates ("YA"), with whom he had a business relationship from 2010 to 2017. Defendant and Counterclaim Plaintiff YA has also brought four tortious interference counterclaims against Lombardo and against his consulting company, DND Construction Services, LLC. ("DND"). The parties oppose all of the respective claims against them, contending that each of the claims fail as a matter of law.

For the reasons that follow, both Defendant YA's summary judgment motion [Doc. # 99] and Counterclaim Defendants Lombardo and DND's summary judgment motion [Doc. # 97] are granted in their entireties.

## I.  Background

### A.  Parties

Plaintiff and Counterclaim Defendant Don Lombardo is an individual who resides in the State of Connecticut. (Lombardo and DND L.R. Stmt. [Doc. # 98] ¶ 1.) Mr. Lombardo had a business relationship with Young & Associates from 2010 to 2017. (*See* YA L.R. Stmt. in Opp. [Doc. # 111] Additional Material Facts ("AMF") ¶ 1.) In 2017, Mr. Lombardo founded DND Construction Services, LLC ("DND").

Defendant and Counterclaim Plaintiff YA "is a building consulting company that works with insurance companies to estimate the cost to repair damage done to buildings after catastrophic disasters or any other type of destruction to commercial and residential buildings." (YA L.R. Stmt. [Doc. # 101] ¶ 1.) YA was originally incorporated in California, but changed its state of incorporation to Nevada in 2013. (*Id.* ¶ 3.) "YA generally receives its work from insurance carriers, usually via adjustor, when a loss occurs to a building; YA then assigns the job to a YA consultant to perform the work." (*Id.* ¶ 4.)

Counterclaim Defendant DND is a limited liability company, which was incorporated in Connecticut on March 17, 2017 and which maintains its principal place of business in Hartford, Connecticut. (Lombardo and DND L.R. Stmt. ¶¶ 2, 64.) DND "does business in the fields of building damage assessments and restoration estimates for various customers, including insurance companies, and is either a limited competitor or a competitor of [YA]. One of its owners is Lombardo." (*Id.* ¶ 49.)

### B.  Lombardo's Tenure with Young & Associates

#### a.  The Hiring and Promotion of Lombardo

In 2010, "YA's consultants were organized in three levels: 1) a managing partner, also sometimes referred to as an executive partner; 2) a partner; and 3) a consultant," terms that YA used "as a means to designate managers from non-managers." (YA L.R. Stmt. ¶¶ 5, 6.) In YA's system, a "managing/executive partner of a geographical region manages the consultants and business in his or her region," while a "partner manages the consultants and business in a territory within a geographical region, reports to the managing/executive partner, and may at times perform damage repair estimating services." (Id. ¶¶ 7, 8.) A consultant, who is at the lowest tier, performs "damage repair estimating services, does not have any management role, and reports to his or her partner. (Id. ¶ 9.) Regardless of the title of "partner," those who worked with YA "were independent contractors who entered into independent contractor agreements with YA," as "YA did not enter into partnership agreements with any individuals or consultants." (Id. ¶ 10.)[1]

---

[1] Plaintiff Lombardo disputes this fact, and others, by pointing to a declaration [Doc. # 109] that he prepared on April 7, 2020 in support of his opposition to YA's Summary Judgment Motion. YA asks the Court to disregard this declaration under the "sham affidavit rule," as it "contradict[s] his own prior testimony." (YA Reply [Doc. # 113] at 1.)

Specifically, YA asserts that "Lombardo is now claiming in the Affidavit that he never signed an Independent Consultant Agreement ('ICA') . . . [when] Lombardo affirmatively testified multiple times in a prior deposition that he did sign an ICA with YA." (Id. at 2 (citing  Ex. 6 (Lombardo 2018 Dep.) to YA Summ. J. Mot. [Doc. # 99-6] at 94-95 (showing Mr. Lombardo a copy of an ICA and asking, "Q: [Did] you ever sign an Independent Consulting Agreement with YA? A: I believe I did."), 110-11 ("Q: . . . Did you have an understanding that you had signed an agreement with YA? A: As I stated earlier, yes, I signed a contract."), 111 ("I know I definitely signed a contract at some point.")).) Additionally, YA notes that Mr. Lombardo now declares that he seeks to enforce a 2010 oral agreement with YA, "as modified in 2012 and 2015," that created a "joint venture, a partnership with respect to my territories and region, or an independent contractor relationship" to continue for "at least ten more years" through to "at least May 2025," (Lombardo. Opp. Decl. [Doc. # 109] ¶ 31), even though the Second Amended Complaint lacks reference to any ten-year agreement or to any 2012 or 2015 modification as to the agreement's duration. Additionally, YA contends that Mr. Lombardo has previously represented that the joint venture or partnership agreement that he now seeks to enforce would "continue indefinitely at

Plaintiff's option," (YA Reply at 4 (quoting Lombardo's Opp. to YA.'s Joint Mot. to Dismiss Second Am. Compl. [Doc. # 38] at 3)), and testified that his agreement did *not* extend for ten years, (*id.* (citing Lombardo 2018 Dep. at 43 ("Q: And did your agreement for a partnership/joint venture with YA have a term or duration? A: Not to my knowledge. Q: So it wasn't fixed for one year or two years or five years or ten years? A: Not that I was aware of."))). Finally, YA asserts that Mr. Lombardo's declaration that he and Mr. Young had agreed upon a settlement on January 17, 2017 is contradicted by his testimony describing a series of offers and that Mr. Young's "final offer" of $ 1.6 million was unacceptable, leaving Mr. Lombardo with "no choice but to move forward with litigation." (*Id.* at 7-9 (quoting Ex. 17 (Lombardo 2020 Dep.) to YA Mot. for Summ. J. [Doc. # 99-17] at 118).)

At oral argument, Mr. Lombardo's Counsel addressed some of these claims. For example, Counsel explained that Mr. Lombardo's 2018 deposition testimony that he "believe[d]" he signed an independent consulting agreement and that "[i]t was common knowledge that all the independents had to sign a consulting agreement," (Lombardo 2018 Dep. at 95), was not contradictory because the question "d[id] you ever sign an independent consulting agreement with YA," (*id.* at 94), was not "tied to any particular agreement or the terms of any particular agreement." However, the transcript shows that the ICA that was shown to Mr. Lombardo at that point in the deposition was the ICA that was attached in a July 5, 2010 e-mail sent to him, (*see id.* (describing July 5, 2010 e-mail exhibit)), that asks him to "review and sign the agreement," (Ex. 11 (Lombardo Form ICA) to YA Mot. for Summ. J. [Doc. # 99-11] at 1).

The Court also notes that other contradictions exist between Mr. Lombardo's prior representations and his April 7, 2020 declaration. Significantly, Mr. Lombardo now declares that at an Atlantic City meeting in 2010, he "had several discussions about [his] potential association with YA the day of the meeting with Ray Young outside of the group presentation" and that he subsequently negotiated a special agreement, (Lombardo. Opp. Decl. ¶ 11), but in his 2018 testimony, Mr. Lombardo admitted that multiple people were "present when [he was] negotiating this deal with Mr. Young" and that these people "all had the same deal," (Lombardo 2018 Dep. 33-34), and "the best way to put it is that Ray told us, 'Here's the deal,' so as far as negotiating the deal, there was really no negotiation. It was just, 'Here's the deal, we'll lay it out to you,' and that was the end of it," (*id.* at 36).

In light of the foregoing substantive inconsistencies, the Court agrees with YA that Mr. Lombardo's April 7, 2020 declaration is inadmissible. *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.") (cited with approval in *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014)); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should

In 2010, YA established an East Coast presence. (*See id.* ¶ 11.) To that end, YA co-owner Raymond Young entered into discussions with Michael Bertino, "an individual with over forty years' experience in the construction management business and who had established contacts in the northeast." (*Id.* ¶ 12.)  "Young and Bertino discussed and agreed that Bertino would join YA and be the managing partner of the Northeast Region and grow that region for YA." (*Id.* ¶ 13.) Mr. Bertino began recruiting individuals for YA's Northeast Region, and he invited Mr. Lombardo to a meeting with Mr. Young in Atlantic City "to discuss the possibility of joining YA." (*Id.* ¶¶ 14, 15.)

The Atlantic City meeting, held in June 2010, was the "first time Lombardo and Young ever met." (*Id.* ¶ 16.) Other YA recruits were also at the meeting, including Kevin Entress and Tim Clippinger. (*Id.* ¶ 17.) YA Chief Financial Officer Mike Kurtz was also present. (*Id.*) At the Atlantic City meeting, the attendees discussed the prospect of Mr. Bertino overseeing the newly formed Northeast Region with Mr. Lombardo, Mr. Entress, and Mr. Clippinger working under him. (*Id.* ¶ 20.)[2] As a result of that Atlantic City meeting, Mr. Bertino entered an agreement with YA to join

---

be disregarded on a motion for summary judgment."); *Bourke v. MAN Engines & Components, Inc.*, 303 F. Supp. 3d 227, 235 (D. Conn. 2018) ("An affidavit . . . submitted to create a 'sham issue of fact' is inadmissible."); *Blake v. Developmental Servs.*, 278 F. Supp. 3d 519, 524 n.2 (D. Conn. 2017) (declining to credit affidavit and concluding it was "not sufficient to create a dispute of fact because it directly contradicts . . . deposition testimony"). As such, the Court will not credit the declaration for the purposes of determining whether a genuine issue of material fact exists at this stage.

[2] Mr. Lombardo objects to "portions of the deposition of nonparties Bertino, Entress, and Clippinger" contained in paragraphs 18, 20, 21 and 23 of YA's L.R. Statement "on the grounds that the testimony is speculative, hearsay, and lacks adequate foundation and therefore cannot be presented in a form that would be admissible in evidence." (Lombardo's Opp. to YA's Mot. for Summ. J. [Doc. # 107] at 14.) However, the testimony referenced does not contain any hearsay statements but rather addresses these non-parties' impressions of the Atlantic City meeting, of

the company as Managing Partner and "oversee the development of YA's business in Hartford, Connecticut, Boston, Massachusetts, Philadelphia, Pennsylvania and the New Jersey and New York areas (the 'Northeast Region')." (*Id.* ¶ 19.) It was further discussed that Mr. Lombardo would be made the Partner of the Hartford office and that Mr. Entress would be made the Partner of the Philadelphia office. (*Id.*) According to Mr. Lombardo's 2018 deposition, he was given the "same deal" as Mr. Entress, (Lombardo 2018 Dep. 33-34), and that "Ray told us, 'Here's the deal,' so as far as negotiating the deal, there was really no negotiation . . . that was the end of it," (*id.* at 36).

At or shortly after the Atlantic City meeting, YA provided Mr. Lombardo and Mr. Entress copies of its form Independent Consulting Agreement ("ICA"). (YA L.R. Stmt. ¶ 23.) The form ICA provided that "the parties hereto are independent contractors, and nothing contained in this Agreement shall be construed to place them in the relationship of partners, principal and agent, employer and employee, or joint venturers." (Lombardo Form ICA at 1.) The ICA set a term of "one year from date of this agreement unless sooner terminated." (*Id.* at 4.)

The ICA also contained an addendum discussing what was termed "override" compensation. (*Id.* at 11.) The Override Compensation Addendum gave the signatory the authority to "engage the services of a Sub-Consultant to perform a portion of or all of the work on a particular Assignment." (*Id.*) It then set forth a payment schedule for "'override payments' from YA, which are a percentage of the profit made in [a] specific territory." (YA L.R. Stmt. ¶ 22.)

On July 2, 2010, Mr. Lombardo sent Mr. Young, Mr. Bertino, and Mr. Kurtz an e-mail with a subject line, "Consultant Agreement." (Ex. 12 (Lombardo July 2, 2010 E-Mail) to YA Mot. for

---

which they had firsthand knowledge through their attendance, and of Mr. Bertino's appointment to the role of Managing Partner.

Summ. J. [Doc. # 99-12] at 1.) Mr. Lombardo wrote that he "ha[s] read the Independent Consultant Agreement and ha[s] no issues with it," that he was awaiting the rate spreadsheet laying out the payment structure, and that he wanted to know more about "the next step in Young and Associates process." (*Id.*)

On July 5, 2010, Mr. Kurtz sent Mr. Lombardo an e-mail with the heading, "YOUNG & Associates - Independent Consultant Agreement" and with an attachment titled "NORTHEASTREGIONYAindependentconsultantagrmtPARTNER-MASTER(2010).pdf," which was a copy of the form ICA with a rate spreadsheet detailing the terms of the Northeast Region's override payments attached as an addendum. (Ex. 11 (Kurtz July 5, 2010 E-Mail) to YA Mot. for Summ. J. [Doc. # 99-12] at 1.) In that e-mail, Mr. Kurtz wrote, "Don, here's the contract that I mentioned in my Welcome email. . . . Once you review and sign the agreement, please send me two signed originals and I'll sign both and return one to you for your records." (*Id.*) Mr. Kurtz's e-mail also explained that no changes had been made to the body of the ICA, but that the rate spreadsheet needed Mr. Lombardo's close review. (*See id.*)

Neither party has produced an executed copy of the ICA sent to Mr. Lombardo. However, Mr. Lombardo has made multiple statements indicating that he did sign an ICA with YA. (*See, e.g.*, Lombardo 2018 Dep. at 111 ("I know I definitely signed a contract at some point.").) Additionally, although Mr. Lombardo now declares that he "do[es] not believe there is any binding written agreement" and that he is "certain [he] did not sign" a form ICA "as [he] wanted [his] status as a partner to be clear and [he] did not agree to any restrictive covenants," his recent declaration does admit that "[a]t some point, [he] believe[s] [he] signed some sort of document that pertained to [his] relationship with YA that contained some language relating to [his] partnership status" and

7

that "[i]t is possible that [he] may have marked up a version of the Form ICA and mailed it to YA, but [he] may be mistaken in [his] recollection." (Lombardo Opp. Decl. ¶¶ 14, 16.)[3]

On July 7, 2010, Mr. Kurtz, Mr. Young, and Mr. Bertino finalized the announcement of YA's expansion of the Northeast Region. (Ex. 13 (YA Press Release E-Mail) to YA Mot. for Summ. J. [Doc. # 99-13].) The press release stated that "Mike Bertino will serve as Managing Partner of the Northeast Region overseeing the development" of YA's "two new office locations" in Hartford and Philadelphia. (*Id.*) The press release also stated that "Don Lombardo will assume the position of Partner responsible for the Hartford office," and that "Kevin Entress will assume the position of Partner responsible for the Philadelphia office." (*Id.*)

In March of 2012, YA and Mr. Bertino terminated their business relationship, and Mr. Lombardo became managing partner of the Northeast Region. (YA L.R. Stmt. ¶ 31.) This region eventually extended from Maine to Florida—excluding Georgia—and became known as "Region 26." (*Id.* ¶ 32.)

According to Mr. Lombardo's testimony, he and Mr. Young had a business planning discussion that occurred sometime in 2015 or 2016, where Mr. Young "asked [Mr. Lombardo]

---

[3] Despite his prior testimony and the internal inconsistency in his declaration, Mr. Lombardo now maintains that his work "commenced based on an oral agreement with YA arising out of our series of communications preceding my work." (Lombardo Opp. Decl. ¶ 17.) He states that his "oral agreement in 2010 concerning [his] relationship with YA, as modified in 2012 and 2015, was either a joint venture, a partnership with respect to my territories and region, or an independent contractor relationship," and that "[r]egardless of how the legal nature of the relationship may be viewed, [he] believe[s] that as a result of [his] status as a Partner and later Regional Partner and then Executive Partner" and the aforementioned 2012 and 2015 modifications that he has "a vested stake in one-half of the future profits of [his] region that [he] had built through at least May 2025." (*Id.* ¶ 31.)

what [his] plans were, and [Mr. Young] said to [Mr. Lombardo], 'Could you give us ten years," and [Mr. Lombardo] said, "I don't see why not." (Lombardo 2018 Dep. at 43.)

### b.  The Termination of Mr. Lombardo's Relationship with YA

On October 28, 2016, Mr. Lombardo was notified by e-mail that some of the consultants in his region had complained that he "is dishonest," "doesn't provide" "support" to consultants, "has a lot of insecurities," "may be the wrong person for the job," and struggles with "communication." (Ex. 14 (YA Consultant Complaints) to YA Mot. for Summ. J. [Doc. # 99-14] at 1-2.)

On November 9, 2016, the YA Executive Board reported the initial conclusions of its ongoing investigation into Mr. Lombardo's management of Region 26 and put Mr. Lombardo on a "recovery plan." (Ex. 15 (YA Executive Board Resolution) to YA Mot. for Summ. J. [Doc. # 99-15] at 1-3.) YA then removed the South Carolina and Florida territories from Mr. Lombardo's region. (YA L.R. Stmt. ¶ 34.)

Following the implementation of the recovery plan in November 2016, the relationship between YA and Mr. Lombardo further deteriorated. YA and Mr. Lombardo then "sought to terminate their business relationship," and so "entered into negotiations concerning Lombardo's separation from YA." (*Id.* ¶ 54.)

In January 2017, separation negotiations began in earnest. Mr. Lombardo has alleged that he and Mr. Young had a meeting where they "agreed upon the terms of settlement in the amount of $6,829,186 to be payable over a ten year period at monthly installments of $56,910." (Lombardo Second Am. Compl. ¶ 51.)

On January 21, 2017, Mr. Lombardo sent Mr. Young an e-mail with the subject, "YA Sep[a]ration Agreement," which stated "Ray: As discussed please see the attached DRAFT

agreement." (Ex. 22 (Lombardo January 21, 2017 E-Mail) to YA Mot. for Summ. J. [Doc. # 99-22]
at 1.) The attached document contained a provision stating that "YA shall pay to Consultant the
total aggregate amount of US $6,829,186.00 in monthly installments over a ten-year period." (*Id.*
at 3.)

On February 21, 2017, Mr. Young "sent an e-mail back to Lombardo which . . . stated that
the communication was 'FOR SETTLEMENT PURPOSES ONLY' and that it was necessary that
YA and Lombardo end their relationship." (YA L.R. Stmt. ¶ 56.) That e-mail also stated that "YA
intends to formally execute that change" as to its relationship with Mr. Lombardo "effective
3/1/17," and that YA's "hope" was that the parties could "have an executed Settlement agreement
prior to that time." (Ex. 23 (Young February 21, 2017 E-mail) to YA Mot. for Summ. J. [Doc. # 99-
23] at 1.) The e-mail further stated that "[i]t has not been YA's practice to consider 'Override
Payments' being extended to a departing Consulting Partner past their last day with YA and there
is no contractual obligation to do so," but that "the attached document is offering just that." (*Id.*)

On February 24, 2017, Mr. Young sent Mr. Lombardo an e-mail "following up on [thei]r
phone conversation yesterday" and "stating that he believed 'subject to documentation, [they]
c[ould] reach agreement,' and enclosed a proposed settlement, which included a six-month non-
compete provision, a full release of YA by Lombardo, an agreement that Lombardo would not
solicit any YA consultants for twelve months, and proposed settlement funds in the amount of
$1,600,000.00." (YA L.R. Stmt. ¶ 57 (quoting Ex. 24 (Young February 24, 2017 E-Mail) to YA Mot.
for Summ. J. [Doc. # 99-24] at 1).) Mr. Young further added that, "[o]nce [YA and Mr. Lombardo]
reach an agreement on the foregoing, [they] can incorporate it into a revised letter of intent," and
that he was "available the rest of the day to discuss." (Young February 24, 2017 E-Mail at 1.) He
also acknowledged the possibility that Mr. Lombardo would be forming a new entity, writing that

Mr. Lombardo and an associate "can start a new company for any new work." (*Id.*) Mr. Young also included two disclaimers that the e-mail was "FOR SETTLEMENT PURPOSES ONLY" and that "the foregoing is confidential provided for settlement discussion purposes only and is not a formal offer and shall not be binding until reduced to a written agreement signed by all parties." (*Id.*)

On March 13, 2017, YA Financial Officer Eric Emme "e-mailed and provided Lombardo with two documents that were to be included with the Proposed Separation Agreement." (YA L.R. Stmt. ¶ 58.) Two hours after that e-mail was sent, Mr. Young followed up with Mr. Lombardo to ask for an "update . . . [on] where [they] [we]re with this," and stated that he "would like to finalize" before March 20, 2017. (Ex. 25 (Young March 13, 2017 E-Mail) to YA Mot. for Summ. J. [Doc. # 99-25] at 1.)

On March 22, 2017, "after not hearing from Lombardo, YA sent Lombardo a letter stating that he had seven days to provide comments to the Proposed Separation Agreement, otherwise, YA would 'terminate discussions' concerning the Proposed Separation Agreement and proceed with terminating the relationship with Lombardo." (YA L.R. Stmt. ¶ 60.) After Mr. Lombardo did not respond to the March 22, 2017 letter, YA sent Mr. Lombardo another "letter on April 7, 2017, withdrawing the Proposed Separation Agreement and terminating the parties' relationship." (*Id.* ¶ 61.) "The Proposed Separation Agreement offering $1,600,000.00 payment was Young's final offer to Lombardo." (*Id.* ¶ 62.) Mr. Lombardo has testified that this "final" and "third offer" by Mr. Young was not acceptable to him, and thus, "at that point, we had no choice but to move forward with litigation." (Lombardo 2020 Dep. at 118.)

On April 13, 2017, Mr. Lombardo filed an action against YA in state court, which was later removed to U.S. District Court for the District of Connecticut on June 7, 2017.[4]

## C.     Lombardo's Establishment of DND Construction Services

### 1.   DND's Formation

At some point on or prior to February 25, 2017, Mr. Lombardo entered into plans with David O'Hearn to form their own construction consulting company, which would be named DND Construction Services LLC. (*See* Lombardo 2020 Dep. at 24 (testifying as to February 25, 2017 e-mail concerning the formation of DND).) On February 26, 2017, Mr. Lombardo and Mr. O'Hearn exchanged e-mails discussing a logo for the company and their registration of the internet domain name "dndbuild.com." (*Id.* at 25-26.)

On March 17, 2017, shortly after YA sent the Proposed Separation Agreement to Mr. Lombardo, Mr. O'Hearn submitted Articles of Organization for DND Construction Services, LLC to the Secretary of the State of Connecticut. (Ex. X (DND Articles of Organization) to YA Opp. to DND Mot. for Summ. J. [Doc. # 111-24].)

### 2.   DND's Consultant Hires

---

[4] As explained in an earlier ruling, Mr. Lombardo's suit against YA was originally assigned to the Honorable Alvin W. Thompson, but then voluntarily withdrawn after he brought this second action. (*See* Ruling on R. 41(d) Mot. and Mot. to Dismiss [Doc. # 56] at 2 (discussing *Lombardo v. R. L. Young, Inc.*, No. 3:17-cv-00940 (AWT)).)

In that first lawsuit, Plaintiff amended his complaint once, and then sought leave to amend again. The parties both produced documents and took depositions within the discovery deadline of March 19, 2018. While YA's second Motion to Dismiss and Mr. Lombardo's Motion for Leave to Amend his First Amended Complaint remained pending in that case, Mr. Lombardo filed this action on February 1, 2018. Mr. Lombardo then voluntarily dismissed his first lawsuit four days later.

On April 1, 2017, Mr. Lombardo sent Martin Woods, who became DND's vice president, a copy of YA's consultant directory, which was posted on YA's public website. (*See* Lombardo Dep. 2020 at 81, 85; Ex. 18 (Directory) to Lombardo Reply [Doc. # 112-2].)

Following its formation, DND hired Jack Murray, Richard Berdan, Brian Walsh, Brendan Smith, and Wesley Bolick (collectively, the "Consultants"), all of whom had previously performed consulting work for YA. (*See* YA L.R. Stmt. in Opp. AMF ¶ 33.)[5] Mr. Murray had performed consulting work for YA from January 1, 2015, (*see* Lombardo and DND L.R. Stmt. ¶ 9), to May of 2017, (*see* Ex. G (Emme Decl.) to YA L.R. Stmt. in Opp. [Doc. # 111-7] ¶ 24). Mr. Murray then "began working as an employee consultant for DND" on January 8, 2018. (Lombardo and DND L.R. Stmt. ¶ 52.) Mr. Berdan had performed consulting work for YA beginning in or around 2012, with their relationship ending in a termination letter dated November 1, 2017. (*See* Ex. E (Berdan Termination Letter) to YA L.R. Stmt. in Opp. [Doc. # 111-5].) Mr. Berdan submitted a W-9 tax form to DND for independent contracting work on June 5, 2017, and he received an offer letter to work as a regional consultant for DND on August 30, 2017. (*See* Ex. Q (Berdan E-Mails) to YA L.R. Stmt. in Opp. [Doc. # 111-17].) Mr. Walsh worked as a consultant for YA from approximately July 8, 2011, to sometime on or around May 31, 2017, but continued to close out some matters in

---

[5] In its Rule 56(c) response, YA contends that DND "solicited and encouraged YA consultants to terminate their business relationships with YA in order to work for DND." (YA L.R. Stmt. in Opp. ¶ 32.) However, YA does not provide a citation to the record to support this claim. YA's subsequent material facts only state that Mr. Walsh, for example, "worked directly under Lombardo for over six years while affiliated with YA and communicated with Lombardo 'frequently and at least weekly before Lombardo left YA,'" and that Mr. Murray "kept in touch after Lombardo's relationship with YA terminated and while Murray was still with YA, Lombardo told Murray he was starting DND and that he would be offering a benefits package as a part of the employment agreement for DND's consultants." (*Id.* ¶¶ 41, 47.)

the weeks that followed. (*See* Ex. F (Walsh Dep.) to YA L.R. Stmt. in Opp. [Doc. # 111-6] at 50.)
Mr. Walsh "began working as an employee consultant for DND" on or around June 5, 2017. (*See*
Lombardo and DND L.R. Stmt. ¶ 53.) Mr. Smith had a consulting relationship with YA from
approximately February 29, 2016 to July 27, 2017. (*See* Lombardo and DND L.R. Stmt. ¶ 6; Ex. D
(Smith Termination Letter) to YA L.R. Stmt. in Opp. [Doc. # 111-4] at 1.) Mr. Smith "began
working as an employee consultant for DND" on or about August 5, 2017. (*See* Lombardo and
DND L.R. Stmt. ¶ 50.) Mr. Bolick did consulting work for YA from approximately 2015 to 2018.
(*See* Ex. BB (Bolick Dep.) to YA L.R. Stmt. in Opp. [Doc. # 111-28] at 21.) Mr. Bolick then worked
for DND from 2018 to 2020. (*See id.* at 20.)

These Consultants all signed and returned ICAs to YA when they began working with the
company. (*See* Lombardo and DND L.R. Stmt. ¶¶ 11, 13-15, 17; Ex. CC (Bolick ICA) to YA L.R.
Stmt. in Opp. [Doc. # 111-29].) Many of the provisions, such as the non-compete provision, of
these ICAs were identical or substantially identical to the Form ICA that Mr. Lombardo received
from YA in 2012. (*Compare* Lombardo Form ICA *to* Bolick ICA.) The non-compete provision
prohibited a consultant from providing "the Services being performed under this Agreement or
the Services of the kind or type contemplated in this Agreement, to any Insurance Company or
third-party adjuster with whom Consultant has worked, on behalf of YA or who was referred to
Consultant by YA, in the past two years prior to the termination, without the express written
approval of YA." (Lombardo Form ICA at 4.) Mr. Lombardo has also testified that this six-month
"nondealing" provision in the ICA is "close" to the non-compete language used in DND's own
offer letters to new consultants, but stated that he was "not sure" where DND got that language.
(Lombardo 2020 Dep. at 94-54.)

### 3. DND's Clients

While Lombardo was with YA, YA had contracts and agreements with carriers and third-party adjusters to provide building consulting services to them in exchange for fees. (*See* YA L.R. Stmt. in Opp. AMF ¶ 32.) These clients included but were not limited to Acadia Insurance Company, AIG, AIG Private Client Group, Chubb & Son, Cincinnati Insurance Company, Engle Martin & Associates, The Hanover Insurance Company, Liberty Mutual, McLarens, Nationwide, Pure Insurance, Vermont Mutual Insurance Group, York Risk Services Group, and Zurich. (*See id.*)

Of these companies, Mr. Lombardo has testified that DND has done work for Acadia Insurance Company, Liberty Mutual, Nationwide, Pure Insurance, Selective Insurance, Vermont Mutual Insurance Group, and York Risk Services Group. (*See* Lombardo 2020 Dep. 108, 113-115.) Additionally, Mr. Walsh has testified that Engle Martin reached out to him as he was transitioning from YA to DND. (Walsh Dep. at 53-55.) Mr. Woods also sent networking e-mails to a McLarens executive on May 24, 2017, (Ex. DD (McLarens E-Mail) to YA L.R. Stmt. in Opp. [Doc. # 111-30] at 1), and to a Cincinnati Insurance Company executive on January 31, 2018, (Ex. EE (Cincinnati E-Mail) to YA L.R. Stmt. in Opp. [Doc. # 111-31] at 1). Mr. Woods also listed nine YA clients—including AIG, Zurich, and Chubb—on an April 10, 2017 e-mail about market penetration sent to Mr. Lombardo and Mr. O'Hearn. (Ex. Y (Market Penetration E-Mail) to YA L.R. Stmt. in Opp. [Doc. # 111-25].) In that e-mail, Mr. Woods stated that DND should try to get on their "vendor lists" and describing these companies as "low hanging fruit." (*Id.*)

## II. Discussion

### B. Standard of Review

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought,"

*Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex,* 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on

allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex,* 477 U.S. at 324; *Matsushita,* 475 U.S. at 586).

### C. YA's Motion for Summary Judgment

Mr. Lombardo has alleged the following contractual and equitable claims against YA: estoppel as to YA's joint venturer status (Count Two); breach of a joint venture agreement (Count Three); alternative claim for breach of a partnership agreement (Count Four); alternative claim for breach of an independent contractor agreement (Count Five); unjust enrichment (Count Six); enforcement of a settlement agreement (Count Eight); and declaratory judgment as to the successor liability of YA for the debts to Mr. Lombardo incurred by Young & Associates from when the company was incorporated in California (Count One).[6]

YA moves for summary judgment on all counts.

#### 1. Counts Two and Three: Joint Venture Claims

Mr. Lombardo alleges that, "[i]n 2010, [YA] entered into an agreement with Lombardo to form a joint venture for a 'Northeast Region.'" (Second Am. Compl. ¶ 12.) He further alleges that the parties "agreed and understood that the relationship was to continue year to year indefinitely until Lombardo determined he wanted to withdraw from it." (*Id.* ¶ 13.) Accordingly, at Count Two, he asserts a claim of "estoppel as to [YA]'s Joint Venturer Status" and at Count Three, he

---

[6] Mr. Lombardo also sought "a full, complete accounting from [YA] at its expense for the period 2013 through February of 2017, to include a determination if the Young Defendants have sought to include personal expenses in the alleged corporate expenses of [YA]," at Count Seven, (Lombardo Second Am. Compl. ¶ 49), but conceded this claim in a footnote, stating that "[g]iven Defendant's refusal to produce information necessary to establish his accounting claim, Lombardo does not oppose summary judgment on Count VII." (Lombardo Opp. at 23 n.6). At oral argument, Mr. Lombardo's counsel reiterated that he "has decided not to pursue the excessive overhead portion of his claim." As such, the Court treats Count Seven as voluntarily dismissed.

alleges that YA breached its joint venture agreement with him. YA responds that it did not enter a joint venture agreement with Mr. Lombardo in 2010 or at any other point in their business relationship.

Under Connecticut law, a joint venture "'exists where two or more parties combine their property, money, efforts, skill or knowledge in some common undertaking.'" *Gibson v. Scap*, 960 F. Supp. 2d 373, 381 (D. Conn. 2013) (quoting *Davies v. General Tours, Inc.*, 63 Conn. App. 17, 29 (2001)). "The relationship between contracting parties cannot amount to a joint venture unless the parties so intend." *Id.* (internal quotation marks omitted). "[J]oint ventures relate to a single transaction, whereas partnerships exist for a general business." *Id.* (internal quotation marks omitted).

"To constitute a joint venture, courts in Connecticut prescribe a five part test that requires that (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit, (2) an agreement must evidence their intent to be joint venturers, (3) each must contribute property, financing, skill, knowledge or effort, (4) each must have some degree of joint control over the venture, and (5) there must be a provision for the sharing of both profits and losses." *Censor v. ASC Techs. of Conn., LLC*, 900 F. Supp. 2d 181, 201 (D. Conn. 2012). "Joint ventures require a manifestation of intent by the parties for them to be associated as joint venturers: this manifestation of intent need not be explicit, but the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract." *Direct Link CT, LLC v. Fuling Plastic USA, Inc.*, No. 3:17-CV-727 (SRU), 2019 WL 3766355, at *6 (D. Conn. Aug. 9, 2019) (internal quotation marks and alteration omitted). "To survive summary judgment," a plaintiff bringing a joint venture claim "must come forth with evidence and cannot merely make

conclusions of law without alleging facts which would bring the case within any of the recognized grounds for that particular cause of action." *Id.* (internal quotation marks and alteration omitted).

Here, YA contends that there "is no evidence, written or otherwise," demonstrating any intent to be joint venturers, and that "Lombardo cannot prove that his alleged deal with YA was one of 'joint-control' between the parties while simultaneously contending that the agreement was to last 'until Lombardo determined he wanted to withdraw from it.'" (YA Mem. in Supp. Summ. J. [Doc. # 100] at 15 (quoting Second Am. Compl. ¶ 13).) YA also contends that Mr. Lombardo cannot prove that there was a profit-sharing provision "given that [Mr. Lombardo] has not produced a written contract in this regard, or even consistently identified the alleged terms of an oral contract throughout this litigation." (*Id.*) Additionally, YA asks the Court to "disregard Lombardo's claim that he had a ten-year deal with YA as it is new information raised at the summary judgment phase and, therefore, improper." (YA Reply at 3.)

Mr. Lombardo responds that "the disputed issue as to the nature of Lombardo's agreement with YA (whether a joint venture, partnership, or independent contractor agreement with profit-sharing) is a highly fact-dependent inquiry that hinges on the Parties' competing testimony." (Lombardo Opp. at 2.) Mr. Lombardo asserts that his April 7, 2020 declaration offers evidence of the existence of a joint venture agreement, as that declaration states that in 2012, he and YA entered a "ten-year commitment" where "Lombardo would have control over (and share equally in the profits derived from) the Northeast Region for a ten-year term or until Lombardo's retirement," (*id.* at 4), and that in 2015, "Young asked Lombardo if he would agree to continue to serve in the position of Executive Partner of the Eastern Region for a ten-year term," an offer to which Mr. Lombardo agreed, (*id.* at 5). At oral argument, Mr. Lombardo's counsel also asserted that Mr.

Lombardo's "record of performance starting in 2010 and progressing until at least 2016 was consistent with the formation of a partnership or joint venture."

Although Mr. Lombardo is correct that the "existence of a joint venture in each case is a question of fact to be decided according to the terms of the parties' agreement, the conduct of the parties, the nature of the undertaking, and other surrounding circumstances," *Disorbo v. Consol. Supermarket Supply*, LLC, No. X04HHDCV156060651S, 2016 WL 7138007, at *4 (Conn. Super. Ct. Oct. 31, 2016), a plaintiff still must present "contradictory evidence 'such that a reasonable jury could return a verdict for the non-moving party'" in order to defeat a summary judgment motion. *Direct Link CT*, 2019 WL 3766355, at *2 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Mr. Lombardo has not done so here.

First, as more fully explained *supra* at footnote 1, Mr. Lombardo's April 7, 2020 declaration, which was submitted after YA filed its motion for summary judgment, must be disregarded as to its contradictory claims. In his 2018 deposition, Mr. Lombardo was shown a copy of the ICA that was attached to the July 5, 2010 onboarding e-mail that he received, and he testified that he "believe[d]" that he signed such a contract and that it was "common knowledge that all the independents had to sign a consulting agreement." (Lombardo 2018 Dep. at 95.) He affirmed that statement twice more during his deposition, (*see id.* 110-11 ("Q: . . . Did you have an understanding that you had signed an agreement with YA? A: As I stated earlier, yes, I signed a contract."), 111 ("I know I definitely signed a contract at some point.")), even though he now claims that his relationship with YA was governed by an oral agreement. Additionally, Mr. Lombardo's declaration that negotiated special terms with Mr. Young during "several discussions about [his] potential association with YA the day of the meeting with Ray Young outside of the group presentation" and subsequently by telephone, (Lombardo. Opp. Decl. ¶ 11), contradicts his earlier

20

testimony that multiple people were "present" when he was making his deal with Mr. Young, that these people "all had the same deal," and that "there was really no negotiation" on this take-it-or-leave-it deal, (Lombardo 2018 Dep. 33-36). The Court also finds relevant the timing of Mr. Lombardo's declaration when considering whether it was "intended solely to defeat the motion for summary judgment," given the "greater facility with which a party can craft an affidavit, or shape deposition testimony, when evidentiary gaps have been identified in an adversary's summary judgment arguments." *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194–95 (2d Cir. 2013). As such, Mr. Lombardo cannot rely on his April 7, 2020 declaration to demonstrate a genuine issue of material fact.

Second, even if the Court were to credit Mr. Lombardo's declaration, this declaration impermissibly changes the terms of the agreement as he alleged them in his Second Amended Complaint. *See Mignault v. Ledyard Pub. Sch.*, 792 F. Supp. 2d 289, 301 (D. Conn. 2011) ("It is well established that a party cannot assert a claim for the first time in its motion papers."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). In that Complaint, Mr. Lombardo alleged that he and YA "entered into an agreement . . . to form a joint venture for a 'Northeast Region'" and that they "agreed and understood that the relationship was to continue year to year indefinitely until Lombardo determined he wanted to withdraw from it." (Second Am. Compl. ¶¶ 12, 13.) He also vaguely referred to "substantive changes" made to the agreement in 2012, without specifying the terms of that alleged modification. (*Id.* ¶ 15.) However, in his declaration and his summary judgment briefing, Mr. Lombardo now focuses on the claim that on "two separate occasions," in 2012 and 2015, "Young and Lombardo agreed that Lombardo would have control over (and share equally in the profits derived from) the Northeast Region (later

Eastern Region) *for a ten-year term or until Lombardo's retirement*." (Lombardo Opp. at 12 (emphasis added).) In making these contradictory claims for the first time at summary judgment, Mr. Lombardo improperly circumvents the discovery process, which, if he were allowed to do so, "would greatly diminish the utility of summary judgment as a procedure." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (quoting *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

Third and on the merits, the April 7, 2020 declaration that Mr. Lombardo relies upon does not satisfy the elements of a joint venture. As stated, for parties to establish a joint venture, their "agreement must evidence their intent to be joint venturers." *Censor*, 900 F. Supp. 2d at 201. Mr. Lombardo himself declares that his original oral agreement in 2010 "was either a joint venture, a partnership . . ., or an independent contractor relationship." (Lombardo Opp. Decl. ¶ 31.) Even now, Mr. Lombardo cannot describe which of those relationships he intended when he agreed to work for YA, nor has he pointed to any record evidence demonstrating that he intended to enter "a fiduciary relationship" with YA as opposed to "a simple contract." *Direct Link CT, LLC v. Fuling Plastic USA, Inc.*, No. 3:17-CV-727 (SRU), 2019 WL 3766355, at *6 (D. Conn. Aug. 9, 2019) (internal quotation marks and alteration omitted). Additionally, the record evidence that exists shows that the intent of YA was *not* to form a joint venture, as the ICA that YA sent him, which Mr. Lombardo admitted to have "read . . . and [to] have no issues with," (Lombardo July 2, 2010 E-Mail at 1), contained explicit language that "the parties hereto are independent contractors, and nothing contained in this Agreement shall be construed to place them in the relationship of partners . . . or joint venturers," (Lombardo Form ICA at 1).[7]

---

[7] To the extent that Mr. Lombardo argues that his performance provides evidence of his intent to be a joint venturer—an argument raised for the first time by his counsel at oral

Finally, Mr. Lombardo is wrong in his contention that the question of the existence of a joint venture is exclusively the province of a jury, so long as the plaintiff has made some declaration or allegation that the parties orally agreed to a joint venture. In *Direct Link CT*, the court considered a claim that a joint venture had been established under Connecticut law through "purported 'handshake' and oral agreements." 2019 WL 3766355, at *8. There, the plaintiff offered consistent testimony that he and the defendant made an oral agreement when they "'sat at a table', 'discussed the whole business plan', 'both agreed to it', and 'shook hands and said let's do it.'" *Id.* at *7. The plaintiff there also supported his claim through "'significant email and statements and conduct of the parties . . . pursuant to which the parties operated from more than a year.'" *Id.* at *3 (quoting plaintiff's statement of material facts). Nonetheless, the court concluded that "[e]ven when viewing the evidence in the light most favorable to DLCT, the record does not support a conclusion that the parties ever 'reached a mutual understanding about . . . essential terms' of an agreement that would be necessary in order to form a contract." *Id.* at *8 (quoting *RIDE, Inc. v. APS Technology, Inc.*, 11 F. Supp. 3d 169, 182 (D. Conn. 2014), *reversed on other grounds, RIDE, Inc. v. APS Technology, Inc.*, 612 F. App'x 31, 33 (2d Cir. 2015)). *Direct Link CT* further explained that "[t]here is also no evidence to suggest that the parties, at the purported 'handshake agreement' meeting, ever discussed the allocation of costs and profits, the existence of guarantees, management structure, decision-making responsibility, or the duration of the joint venture," and that "[w]ithout evidence of a 'mutual understanding' about those essential terms, 'a joint venture cannot be formed.'" *Id.* (quoting *RIDE, Inc.*, 11 F. Supp. 3d at 182). Here, Mr. Lombardo has made

---

argument—this performance is equally consistent with performance of this ICA and is not sufficiently probative to defeat YA's summary judgment motion.

inconsistent statements as to the nature of his agreement with YA, and he has provided scant information as to any of the agreement's essential terms. Thus, because Mr. Lombardo has "provide[d] no evidence as to what understanding was developed between the parties . . . a reasonable jury could not find that [YA] had ever had the intention to form a joint venture with [Mr. Lombardo], let alone formed one." *RIDE, Inc.*, 11 F. Supp. 3d at 184.

Accordingly, the Court grants summary judgment to YA on Counts Two and Three.[8]

### 2.   Count Four: Partnership Claim

At Count Four, Mr. Lombardo presents an alternative claim that if the agreement "is deemed not to be a joint venture agreement, then the agreement was a partnership agreement," which YA breached. (Second Am. Compl. ¶¶ 43, 44.)

Under Connecticut's Uniform Partnership Act, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership." Conn. Gen. Stat. §34-314(a). "An association formed under a statute other than" the Uniform Partnership Act "is not a partnership" under this Act "unless such association is a foreign registered limited liability partnership." Conn. Gen. Stat. § 34-314(b). In contrast to a joint venture, which has an intent element, a partnership may be formed "whether or not the persons intend to form a partnership." *Id.* "A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment . . . for services as an independent contractor or of wages or other compensation to an employee." Conn. Gen. Stat. § 34-314(c)(3).

---

[8] Because summary judgment may be granted on this basis, the Court need not address YA's statute of frauds argument, which was raised for the first time in a footnote in its reply brief. (*See* YA Reply at 5 n.2.)

"'The question of whether a partnership exists between particular persons is a mixed question of law and fact. This means that what constitutes a partnership under established facts is a question of law for the court, but the existence of the facts necessary to bring the relation within the tests of partnership, or the determination whether a partnership exists under the evidence and the inferences reasonably drawn from the evidence, is a question of fact for the jury.'" *Lenoble v. Best Temps, Inc.*, 352 F. Supp. 2d 237, 250 (D. Conn. 2005) (quoting 59A Am. Jur. 2d Partnership § 182 (2003)). "In other words, where the facts are susceptible of only one reasonable inference, the question of whether a partnership exists between particular persons is one of law for the court." *Id.* (internal quotation marks and alteration omitted).

YA contends that Mr. Lombardo cannot show that he formed a partnership with YA because "Lombardo has never been an owner of YA and, thus, his association with YA cannot be deemed to be a partnership." (YA Mem. at 17.) YA states its use of the term "partner" was a term of art and that "[a]ny share of profits Lombardo received cannot be construed as having been received in his capacity as a co-owner, but rather, was consistent with the manner in which all YA partners were compensated," which was done through a combination of hourly rate payments and override payments. (*Id.*) Thus, YA argues, "the 'profits' received by Lombardo were part of his compensation for services rendered in his capacity as an independent contractor, thus eliminating any presumption that a partnership existed under Connecticut law." (*Id.*) YA also notes that the ICA, which was the standard form agreement for all of YA's consultants who received the title of "partner," "explicitly set forth that 'nothing contained in this [ICA] shall be construed to place [YA and Lombardo] in the relationship of partners.'" (*Id.* (quoting Lombardo Form ICA at 1).)

As with his argument as to joint venture status, Mr. Lombardo responds that the "test for a partnership in Connecticut is . . . fact-dependent." (Lombardo Opp. at 9.) Mr. Lombardo also

asserts that "[a]t no time did [he] sign YA's Form Independent Consulting Agreement . . . despite receiving copies of it both in person and by email," (*id.* at 2), a statement which was made in his April 7, 2020 declaration and which conflicts with his prior testimony.

Here, the facts are "susceptible of only one reasonable inference," which is that a partnership was never formed between Mr. Lombardo and YA. *Lenoble*, 352 F. Supp. 2d at 250. As is undisputed, the "principals of YA are Raymond Young and Linda Young, who own YA through their trust." (YA L.R. Stmt. ¶ 2.) Mr. Lombardo himself alleges that these principals "owned all of the stock" of YA at "all relevant times." (Lombardo Second Am. Comp. ¶¶ 7, 9.) He makes no allegation and presents no record evidence that he was ever an owner of YA's business.

Additionally, YA was originally incorporated in 2005 under the "General Corporation Law of California," (*see* Ex. 2 (YA California Articles of Incorporation) to YA Mot. for Summ. J. [Doc. # 99-2] at 2), and then it was reincorporated in 2013 under Nev. Rev. Stat. § 78, which is Nevada's chapter on corporations, (*see* Ex. 3 (YA Nevada Articles of Incorporation) to YA Mot. for Summ. J. [Doc. # 99-3] at 3).

Thus, because YA was, during the relevant time period, entirely owned by its principals Raymond and Linda Young and because YA was "formed under a statute other than" the Uniform Partnership Act, Mr. Lombardo cannot now claim that his agreement to lead the Hartford office and then the Northeast Region created a partnership between him and YA that would make him a co-owner of that territory of YA's business. Conn. Gen. Stat. § 34-314(b). The Court grants summary judgment to YA on Count Four.

### 3. Count Five: Independent Contractor Claim

At Count Five, Mr. Lombardo presents a second alternative claim that "[i]f the agreement . . . is deemed not to be either a joint venture agreement or partnership, then the agreement was an

independent contractor agreement with profit sharing," which YA breached. (Second Am. Compl. ¶¶ 45, 46.)

"In Connecticut, a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of an agreement by the opposing party and (4) damages directly and proximately caused by the breach." *Censor*, 900 F. Supp. 2d at 193. "[A]n agreement must be definite and certain as to its terms and requirements. . . . So long as any essential matters are left open for further consideration, the contract is not complete. . . . While all the terms of a contract do not need to be present, all the essential terms must have been agreed on." *RIDE, Inc.*, 11 F. Supp. 3d at 177.

YA agrees that it had an independent contractor agreement with Mr. Lombardo, as Mr. "Lombardo affirmatively testified multiple times in a prior deposition that he did sign an ICA with YA." (YA Reply at 2.) However, YA contends that "no evidence exists that YA breached the ICA in any way." (YA Mem. at 18.)

Mr. Lombardo does not directly address Count Five, but generally argues that the "determination as to whether Lombardo had such an agreement with YA and, if so, what form of agreement (i.e., whether a joint venture, a partnership, or an independent contractor agreement with profit-sharing)" involves "highly fact-dependent questions properly left for a jury's consideration." (Lombardo Opp. at 8-9.)

As previously explained in the context of his joint venture claims, Mr. Lombardo has failed to provide evidence that would allow a reasonable jury to conclude that an agreement with "definite and certain . . . terms and requirements" was made as to the continuation of profit-sharing following the termination of his relationship with YA. *RIDE, Inc.*, 11 F. Supp. 3d at 177. The only evidence that Mr. Lombardo has provided as to the terms of any such agreement is his testimony

that, sometime in 2015 or 2016, "[t]here was a discussion" where Mr. Young "asked [Mr. Lombardo] what [his] plans were, and [Mr. Young] said to [Mr. Lombardo], 'Could you give us ten years," and [Mr. Lombardo] said, "I don't see why not." (Lombardo 2018 Dep. at 43.) This, on its own and bare of any other essential terms, cannot create a valid profit-sharing agreement as to Mr. Lombardo's former YA territory that extends either indefinitely, as was originally alleged, or for ten years, as is now claimed. Accordingly, YA is entitled to summary judgment on Count Five as a matter of law.

### 4. Count Six: Unjust Enrichment

At Count Six, Mr. Lombardo alleges that "[a]s a result of the extensive efforts of Lombardo, as well as the payment for expenses incurred by the national operations of YANV, the defendants have been unjustly enriched." (Second Am. Compl. ¶ 47.)

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006) (internal quotation marks omitted).

YA contends that it "more than fairly compensated Lombardo pursuant to the terms of the ICA," as his "compensation at YA was consistent with that of other YA managing partners and partners in that he received payment for the hours he billed and a percentage of the override payments from his respective region." (YA Mem. at 26.) YA adds that "Lombardo never disputed his compensation while he was associated with YA, and there is no evidence in the record to the contrary." (*Id.* at 27.) YA also states that "[u]pon Lombardo's disassociation from YA, the override payments were paid to another consultant who took over his role of managing partner—YA did not take all the override payments for itself." (*Id.* at 26-27.)

28

In response, Mr. Lombardo asserts that "a genuine issue of material fact exists as to whether Defendant unjustly failed to compensate Lombardo for valuable services rendered," and "[t]hat issue is for the jury to decide." (Lombardo Opp. at 22.) However, he has not identified what the genuine issue of material fact is with any specificity beyond that statement.

As Mr. Lombardo represents, his override payments, which amounted to fifty percent "of the net profits due from his region," were "as follows: a) 2010 - $110,850; b) 2011 - $690,813; c) 2012 - $674,534; d) 2013 - $637,208; e) 2014 - $501,575; f) 2015 - $699,923; and g) 2016 - $819,474." (Lombardo Opp. Decl. ¶ 32.) While it is true that "[u]njust enrichment is, consistent with the principles of equity, a broad and flexible remedy," there is no evidence in the record to indicate that Mr. Lombardo's payments, which totaled more than $4 million over seven years and were made according to a fifty-fifty split between the parties, were unfair. *Vertex*, 278 Conn. at 573. This same arrangement applied to YA's other independent contractors, and Mr. Lombardo has provided no evidence that he ever took issue with this payment arrangement during his time with YA.

As such, summary judgment is granted on Count Six.

### 5. Count Eight: Enforcement of Settlement

At Count Eight, Mr. Lombardo alleges that he and YA "negotiated terms by which [he] would separate from [YA] and terminate all rights he had in regard to the business he had developed," and that "the parties had agreed upon the terms of settlement in the amount of $6,829,186 to be payable over a ten year period at monthly installments of $56,910 without interest which was incorporated in a written document," but that Mr. Young "refused to sign the agreement, as to which Lombardo seeks to enforce herein." (Second Am. Compl. ¶ 51.)

"A settlement agreement is a contract among the parties." *Kidder v. Read*, 150 Conn. App. 720, 734 (2014) (internal quotation marks omitted). "A contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation." *Massey v. Town of Branford*, 118 Conn. App. 491, 498 (2009) (internal quotation marks omitted). "The law does not regard an arrangement as completed which the parties regard as incomplete." *Id.* (internal quotation marks and alterations omitted). "In construing the agreement the decisive question is the intent of the parties as expressed," and the "intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish." *Id.* (internal quotation marks and alterations omitted). Where "there [i]s no meeting of the minds," the settlement "agreement [i]s not enforceable." *Amica Mut. Ins. Co. v. Welch Enterprises, Inc.*, 114 Conn. App. 290, 295 (2009).

YA contends that the "evidence in the record and the timeline of the correspondence between Young and Lombardo unquestionably establish that a settlement agreement was never reached between the parties as there was no mutual meeting of the minds or agreement upon amount or terms." (YA Mem. at 25.) In support of this claim, YA states that "[f]rom January 17, 2017 to March 22, 2017, four emails, one letter, and at least one telephone conversation were had that involved further settlement negotiations between Lombardo and Young, on behalf of YA," demonstrating that a settlement was never finalized. (YA Reply at 7.) YA also notes that "Lombardo himself testified that the Proposed Separation Agreement was just an offer by YA and that settlement terms were never finalized." (YA Mem. at 25.) With regard to Mr. Lombardo's April 7, 2020 declaration that a handshake settlement deal was made, YA claims that Lombardo "changes his prior testimony and ignores admissible evidence in the record to support his position that there was an alleged settlement." (YA Reply at 6.)

Mr. Lombardo responds that "[c]ontrary to Defendant's assertions, Lombardo and Young did reach a final deal on the settlement amount and terms and shook hands in agreement," and that the "fact that the parties agreed to subsequently memorialize the agreement in writing does not undercut the existence of an enforceable oral contract in the first instance." (Lombardo Opp. at 17.) He states that he will "testify credibly at trial that the parties reached a final oral settlement agreement," (*id.* at 18), and that Mr. Lombardo subsequently "resisted Young's attempts to rewrite the agreement the parties had reached on January 17, 2017," (*id.* at 7), and thus a genuine issue of material fact remains in dispute.

The Court agrees with YA that Mr. Lombardo's contention that a "final deal" had been reached by handshake and oral agreement is fatally undercut by his own testimony that, late in termination discussions, he "asked [Mr. Young] if he wanted to litigate or settle it. He said to settle it. But he put on an offer that was unacceptable. And that is when it led to litigation." (Lombardo 2020 Dep. at 118.) Mr. Lombardo elaborated that this offer, in the amount of $1.6 million, "was like the third offer," and that he found this offer unacceptable, which left him "no choice but to move forward with litigation," as Mr. Young had "said that was his final offer." (*Id.*) In admitting to the existence of these multiple offers, some of which specifically disclaimed that the communications were "FOR SETTLEMENT PURPOSES ONLY" and that "the foregoing . . . is not a formal offer and shall not be binding until reduced to a written agreement signed by all parties," (Young February 24, 2017 E-Mail at 1), Mr. Lombardo acknowledged that there had not yet been a meeting of the minds as to a settlement agreement.

Accordingly, the Court grants summary judgment to YA on Count Eight.

### 6.  Count One: Declaratory Judgment

Finally, Mr. Lombardo seeks a declaratory judgment that "YANV"—that is, YA as incorporated in Nevada—"should be considered the successor of YACA,"—that is, YA as incorporated in California—"with respect to YACA's agreement obligations." (Second Am. Compl. ¶ 25.)

"A court may issue a declaratory judgment '[i]n a case of actual controversy within its jurisdiction.'" *Par. of St. Paul's Episcopal Church v. Episcopal Diocese of Connecticut Donations & Bequests for Church Purposes, Inc.*, No. 3:05CV1505 (JBA), 2006 WL 8448063, at *7 (D. Conn. Aug. 21, 2006) (quoting 28 U.S.C. § 2201(a)); *see also Gen. Ins. Co. of Am. v. Okeke*, 182 Conn. App. 83, 95 (2018) (requiring an "actual controversy between or among the parties to the dispute" and "that the determination of the controversy will result in practical relief to the complainant" for a declaratory judgment to issue under Connecticut law).

YA contends that "no actual case or controversy exists for purposes of the declaratory judgment claim and, therefore, the cause of action fails as a matter of law." (YA Mem. at 27.) YA further states that it "has never attempted to avoid liability to Lombardo (or any person or entity) on the basis that YA is no longer a California corporation and is now incorporated in Nevada," and "a declaration by this Court of 'YANV's' successor liability for 'YACA' will not result in any practical relief to Lombardo given the fact has never been in question." (*Id.* at 28.)

Mr. Lombardo responds that "[e]ven though Defendant apparently concedes the issue of successor liability, that does not necessarily mean that there is no justiciable controversy warranting declaratory judgment," because "[i]n the event that Lombardo prevails on his claims in this action, he may need a declaratory judgment . . . in order to identify the entity against which he should properly seek judgment." (Lombardo Opp. at 23.)

In light of YA's concession that the business, as incorporated in Nevada, is a successor the prior California corporation and given that Mr. Lombardo has not prevailed on any claim in this action, summary judgment is granted on Count One on mootness grounds.

### D.  Lombardo's Motion for Summary Judgment

Defendant YA has also filed four tortious interference counterclaims against Plaintiff Lombardo and against his consulting company, DND Construction Services, LLC. At Count One and Count Three, YA alleges that Mr. Lombardo and DND (collectively, "DND") tortiously interfered with YA's contractual agreements with its independent consultants and with YA's business expectancies as to those same consultants. At Count Two and Count Four, YA claims that DND tortiously interfered with YA's contractual agreements with its customers and its business expectancies as to those same customers.

DND moves for summary judgment on all four counts.

### 1.  Counts One and Three: Tortious Interference as to Consultants

At Count One, YA alleges that DND interfered with YA's contracts with its Consultants. Specifically, YA alleges that DND was aware of the non-compete agreements that YA's consultants had made in their ICAs and that DND "intentionally and maliciously interfered with YA's contracts and agreements with certain consultants by soliciting the Consultants without justification to breach the Consultant Agreements to work for DND Construction during the Restricted Period and unlawfully misuse the Confidential Information in violation of the Consultant Agreements and, as a direct result, certain consultants have breached the Consultant Agreements to perform work for DND Construction during the Restricted Period and have solicited YA customers through misuse of the Confidential Information." (YA Counterclaim Compl. ¶ 20.)

Relatedly, at Count Three, YA alleges that DND interfered with YA's business relationships with its Consultants "by soliciting the aforementioned consultants who had contractual relationships and obligations to YA to leave and further, to breach their Consultant Agreements by violating the restrictions regarding the Restricted Period and Confidential Information." (*Id.* ¶ 35.)

To succeed on a tortious interference claim, a plaintiff must prove "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000).[9] However, "not every act that disturbs a business expectancy is actionable": "A claim is made out only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Am. Diamond Exch., Inc. v. Alpert*, 101 Conn. App. 83, 90 (2007) (internal quotation marks and alterations omitted). "Accordingly, the plaintiff must plead and prove at least some improper motive or improper means." *Id.* A plaintiff does so by showing "that the defendant's conduct was in fact tortious," an element that "may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Blake v. Levy*, 191 Conn. 257, 261 (1983) (internal quotation

---

[9] When a party brings a tortious interference claim specifically premised on interference with a contractual relationship, the elements are essentially the same. *See Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 212–13 (2000) ("A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct.").

marks omitted). "In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification. In other words, the plaintiff bears the burden of alleging and proving lack of justification on the part of the defendant." *Alpert*, 101 Conn. App. at 93 (internal quotation marks and alterations omitted).

In assessing tortious interference claims, Connecticut courts look to Section 767 of the Restatement (Second) of Torts which "provides in relevant part: 'In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.'" *Id.* at 91 n.4. The Restatement also provides that a defendant "does not interfere improperly with the other's relation if '(a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.'" *Eastlander Grp., Llc v. Severin Hills, LLC*, No. X06-CV 4-4003573 S, 2005 WL 3292032, at *3 (Conn. Super. Ct. Nov. 8, 2005) (quoting Restatement (Second) of Torts § 768 (1979)).

DND contends that it has "every right to compete directly or work for a competitor of [YA]," and that its "right to compete is sufficient justification and any gains that Lombardo and DND might obtain from any business that is competitive with [YA] does not make such competition tortious interference." (Lombardo and DND Mem. Supp. Mot. for Summ. J. [Doc. #

97-1] at 20.) DND also asserts that "any knowledge that Lombardo and DND may have had about [YA]'s former consultants' agreements with [YA] cannot alone constitute willful or malicious conduct to transform that knowledge into a tortious interference claim." (*Id.* at 20.) More specifically, DND asserts that it "did not improperly solicit YA consultants," and that YA itself "admits that consultants left YA to work with DND because they were dissatisfied with the nature of their work and workload at YA." (Lombardo and DND Reply [Doc. # 112] at 3 (citing YA Opp. [Doc. # 110] at 17 ("Smith left YA because he was dissatisfied with the amount of work available to him"); *id.* ("Murray also left YA because he was dissatisfied with the nature of work and workload.")).) Additionally, DND asserts that YA has not alleged "with any specificity what competitive work Lombardo and DND have engaged in or what confidential information of [YA] they have allegedly used," and that "[r]egardless, the affidavits of Lombardo, Smith, Berdan, Walsh and Murray all establish that none of them have used any confidential information of [YA] in any work that is competitive with [YA]." (*Id.* at 20-21.) DND also contends that YA's "allegations that Lombardo and DND have acted with an improper motive, maliciously and with an intent to harm [YA] by engaging in competitive business against it" are "conclusory," as "[n]othing specific to support these allegations is alleged." (*Id.*)[10]

YA responds that there "are copious instances of Counterclaim Defendants' misconduct in the record." (YA Opp. at 12.) Specifically, YA points out that "Lombardo set up his competing business, DND[] while still affiliated with YA," and that he planned and organized his competing business while having full access to YA's system and records, which included confidential

---

[10] DND also makes an extensive alternative argument as to the validity of YA's ICAs with the Consultants, which is unnecessary to address.

information such as client lists and a directory of YA consultants." (*Id.*) YA also asserts that the record "demonstrates that Lombardo and DND employees were strategically keeping in touch with YA consultants," and that "Lombardo was aware of the ICAs that the consultants entered into with YA and he acted tortiously in complete disregard for such agreements." (*Id.* at 14.) YA also argues that malice can be proven at trial through its evidence that Lombardo, while forming DND, "continued to work with YA until April 7, 2017, when YA sent a letter terminating the parties' relationship," and through its evidence that Mr. Lombardo, "when soliciting YA consultants to work for DND, noted specific incentives DND would offer them that YA did not offer." (*Id.* at 16- 17.) Additionally, YA claims that there is "there is evidence that the Consultants that left YA for DND acted with malice" in their own right. (*Id.* at 17.) YA asserts that Consultant "Smith left YA because he was dissatisfied with the amount of work available to him" and Consultant "Murray also left YA because he was dissatisfied with the nature of work and workload" and "took three files from YA to DND without YA's consent when he terminated his relationship with YA and moved to DND." (*Id.* (citing Ex. GG (Murray Dep.) to YA L.R. Stmt. in Opp. [Doc. # 111-33] at 57).)

The Court agrees with DND that "[t]here is nothing tortious about competition" and that YA has failed to offer evidence showing "more than the possibility that it may face legitimate competition" here. *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 272 (2d Cir. 1990); *see also Ira Green, Inc. v. Military Sales & Serv. Co.*, 775 F.3d 12, 22 (1st Cir. 2014) ("Legitimate competition between business rivals constitutes a justification for interference." (citing Restatement (Second) of Torts § 768 (1979))). Here, YA and Mr. Lombardo entered discussions to terminate their relationship by January 21, 2017. On February 24, 2017, YA Owner Ray Young specifically acknowledged through an e-mail that Mr. Lombardo may be "start[ing] a new company for any

new work," demonstrating that both parties understood that Mr. Lombardo's relationship with YA was coming to an end and that he would need to find new work. (Young February 24, 2017 E-Mail at 1.) This e-mail was sent prior to Mr. Lombardo's February 26, 2017 e-mail discussions with Mr. O'Hearn regarding the formation of their own construction consulting company. (Lombardo 2020 Dep. at 25-26.) In light of this acknowledgment by Mr. Young, there is insufficient evidence from which reasonable jurors could conclude that Mr. Lombardo employed "wrongful means" in establishing DND, that his formation of the company created an lawful restraint on trade, or that DND's founding was without purpose "to advance his interest in competing with the other.'" Restatement (Second) of Torts § 768 (1979).

Additionally, the record lacks evidence that DND acted with "malice" in hiring YA consultants. DND properly observes that under Connecticut law, "[m]ere knowledge of the restrictive covenant alone does not rise to a claim of tortious interference with either the employer's contractual relations with their employees or their business relations with their clients." (Lombardo and DND Mem. at 18.) As the Connecticut Supreme Court has determined, "allegations of mere knowledge of a restrictive covenant coupled with allegations that the defendant encouraged the restricted party to [do business] in the restricted area do not 'fairly imply that the [defendant] acted with . . . malice.'" *Webster Fin. Corp. v. McDonald*, No. CV084016026S, 2009 WL 416059, at *12 (Conn. Super. Ct. Jan. 28, 2009) (quoting *Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 536 (1988)). Connecticut "[s]uperior courts have also reached the same conclusion that mere knowledge of a restrictive covenant alone does not arise to a claim for tortious interference with either the employer's contractual relations with their employees or their business relations with their clients." *Id.* "Nor does hiring an employee in violation of a restrictive covenant arise to a claim for tortious interference." *Id.* "While hiring one of the plaintiff's

employees may be viewed as interference with the plaintiff's business, it does not mean that it is tortious since not all interference is considered to be tortious." *Sanford Hall Agency, Inc. v. Dezzanni*, No. CV044000576, 2004 WL 3090673, at *7 (Conn. Super. Ct. Dec. 2, 2004). Here, DND had "an adequate, business-related justification to hire 'a skilled professional . . . whose expertise would benefit [its] customers.'" *Webster Fin. Corp.*, 2009 WL 416059, at *12 (quoting *Sanford Hall Agency*, 2004 WL 3090673, at *7). The facts that DND offered employment benefits that were unavailable at YA and that some of the Consultants left because they were unhappy with their work at YA do not change this analysis and thereby allow malice to be imputed to DND, as they do nothing to show that DND acted improperly or without justification in hiring these Consultants.

Finally, YA's assertion that Mr. Lombardo, during his final days with YA and during the formation of DND, may have utilized "confidential information" in the form of "a directory of YA consultants," (YA Opp. at 12), cannot support YA's claim of tortious interference as to those consultants because that directory is posted on YA's public website, and thus cannot be claimed to be confidential, (See Lombardo Dep. 2020 at 81, 85; Directory at 1).

Accordingly, the Court grants summary judgment in favor of DND on Counts One and Three.

### 2. Counts Two and Four: Tortious Interference as to Customers

The remaining two counts are focused on YA's contractual and business relationships with its clients.

At Count Two, YA alleges DND was "aware of [YA's] Customer Contracts, and the terms thereof," and were aware of "Confidential Information" pertaining to those contracts through Mr. "Lombardo's former consulting relationship with YA." (Counterclaim Compl. ¶ 27.) YA further alleges that Mr. "Lombardo, individually and on behalf of DND Construction, using the

Confidential Information, intentionally contacted and targeted YA's customers with Customer Contracts to improperly solicit them to alter or cease their contractual relationship with YA and to send less business to YA." (*Id.* ¶ 27.)

At Count Four, YA brings a parallel tortious interference claim concerning YA's business relationships with its clients, alleging that "[h]aving knowledge of these [business] relationships [with clients], Lombardo, individually and on behalf of DND Construction, and DND Construction, by and through Lombardo, Jack Murray, Brian Walsh, Brend[a]n Smith, Richard Berdan, and others, intentionally interfered, without justification, with these relationships by directly communicating and marketing competing services to YA's customers using contacts provided by YA or developed through Lombardo's former consulting relationship with YA, and by soliciting DND Construction consultants to violate their Consultant Agreements by misappropriating the Confidential Information and violating the Restricted Period to directly solicit particular contacts at YA's customers using their knowledge of the terms of the Customer Contracts." (*Id.* ¶ 42.)

As earlier discussed, to succeed on a claim of tortious interference, a plaintiff must demonstrate that (1) there exists "a business relationship between the plaintiff and another party"; (2) the defendant, with some improper motive or through some improper means, "intentional[ly] interfere[d] with the business relationship while knowing of the relationship," and (3) "as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc.*, 255 Conn. at 27.

As a basic matter, DND contends that the record lacks any evidence of tortious interference, a proposition that YA opposes. In rebutting DND's Motion for Summary Judgment, YA contends that Mr. Lombardo was "aware YA had contracts with certain insurance customers to provide building consulting services to them in exchange for fees," and that "[w]ithin DND's

first two years of operation, DND generated revenue of approximately $2,141,336.83" at least in part from YA clients. (YA Opp. at 12-13.)[11] YA further contends that one of DND's Consultants, Mr. Murray, "testified that he downloaded YA customer files onto his personal laptop during the transition from YA to DND for the purpose of continuing to work on certain YA customer files" once employed by DND. (*Id.* at 15 (citing Murray Dep. at 58-59).) YA also asserts that Mr. Lombardo had access to its "confidential information such as client lists" when he was in the process of forming DND, (YA Opp. at 12), and that Mr. Woods' April 10, 2017 e-mail about market penetration identified nine insurance companies that were YA customers as "low hanging fruit." (Market Penetration E-Mail at 3.)

DND responds that its solicitation of YA clients is "not tortious conduct," but rather "lawful business competition." (Lombardo and DND Reply at 8.) DND notes that its Consultants explicitly testified that they did not solicit YA clients. (*Id.*) DND asserts that, even assuming *arguendo* that the Consultants did solicit YA clients, YA's claim would still fail as a matter of law because the Connecticut Supreme Court has held that the hiring of an individual with a restrictive covenant and the encouragement of a violation of that restrictive "is not sufficient to prove tortious

---

[11] Although YA, in its brief, claims that all of this money was generated from YA clients, the exhibits that YA cites to support this claim only indicate that at least some of this revenue was generated from clients who had previously worked with YA. The April 10, 2018 Management Report, (Ex. AA to YA Opp. to DND Mot. for Summ. J. [Doc. # 111-27]), and the March 24, 2019 Management Report, (Ex. S to YA Opp. to DND Mot. for Summ. J. [Doc. # 111-29]), that YA cites for this proposition show DND's profits and losses, but they do not contain any information as to DND's clients. YA also cites a portion of Mr. Lombardo's 2020 deposition and an e-mail chain that Mr. Woods sent to Mr. Lombardo for this proposition, but those exhibits only show that DND sought and received work from Liberty Mutual. (*See* Lombardo 2020 Dep. at 104-105; Ex. Z (Liberty Mutual E-Mail Chain) to YA Opp. to DND Mot. for Summ. J. [Doc. # 111-26].) Finally, YA cites Mr. Bolick's deposition, but Mr. Bolick only testified that he intended to solicit AIG while at DND, but that the "solicitation was never completed." (Bolick Dep. at 55.)

interference." (*Id.* (citing *Wiederlight*, 208 Conn. at 536 ("The assertion that IAC 'encouraged' Wiederlight to sell commercial insurance in the restricted area when it knew or should have known of the covenant's terms does not fairly imply that IAC acted with 'fraud, misrepresentation, intimidation or molestation' or that it acted with malice.")).) Relatedly and in response to YA's contention that one of the Consultants took customer files from YA, DND notes that the "three files" that "Murray continued to work on after moving from YA to DND" were "transferred at the request of the adjuster who worked for the customer and with notice to YA." (*Id.* at 9; *see also* Murray Dep. at 59 ("I was in communication with all three of these adjusters on almost a daily basis on things, and at some point, I had to bring to their attention that my service with YA was coming to an end. At that point, . . . they requested that I carry the files over and keep continuity of them.").) On this point, DND further notes that there is "no evidence that YA objected to the transfers or rejected the customers' requests," and that Mr. Emme "testified that YA has always honored a customer's request to transfer its files," as "YA's insurance customer files belong to the *customer*, not to YA." (Lombardo and DND Reply at 6-7 (citing Ex. 17 (Emme Dep.) to Lombardo and DND Reply [Doc. # 112-1] at 112-15) (emphasis in brief).)

The Court agrees with DND that YA has not submitted evidence that could allow a reasonable jury to conclude that DND acted with malice in its conduct related to YA customers. As previously explained, DND's solicitation of YA clients on its own cannot amount to tortious interference because "[t]here is nothing tortious about competition." *Juster*, 901 F.2d at 272. Furthermore, YA has not offered any evidence that the Consultants violated the six-month restrictive period through their work with DND. Mr. Murray, Mr. Bolick, and Mr. Smith each denied soliciting YA customers following their dissociation from the company. (*See* Murray Dep. at 32; Bolick Dep. at 73-75; Ex. H (Smith Dep.) to YA Opp. to DND Mot. for Summ. J. [Doc. # 111-

8] at 71.) In his deposition, Mr. Walsh testified that some of his clients from YA "requested that [he] continue to work on the[ir] file[s]" when he transferred to DND, but there is otherwise no testimony that suggests he solicited new work from YA clients. (Walsh Dep. at 58.) As to Mr. Berdan, there is nothing in the record that suggests that he solicited YA customers during or after his six-month restrictive period.

Additionally, Mr. Murray's transfer of the client files cannot support a claim of tortious interference as to YA customers as this "information belonged to [Murray]'s clients, not [YA]." *DeWitt Stern Grp., Inc. v. Eisenberg*, 734 F. App'x 48, 51 (2d Cir. 2018). Finally, Mr. Woods's e-mail regarding market penetration that described nine YA customers as "low hanging fruit" is not itself probative that DND used confidential YA information or otherwise acted with malice because Mr. Woods never worked for YA or had access to its files. (Market Penetration E-Mail at 3.)[12]

---

[12] At oral argument, YA's Counsel made a related contention that Mr. Woods sent e-mails to YA customers and that the only way Mr. Woods could have had access to these customers' contact information was through Mr. Lombardo or the Consultants.

However, the three e-mails cited for this point are not probative that Mr. Woods tortiously solicited YA customers or otherwise took advantage of confidential YA information. The first e-mail, which Mr. Woods sent to a McLarens executive on May 24, 2017, opens by stating that "[i]t was good seeing you yesterday at The New England Claims outing." (McLarens E-Mail at 2.) This opening plainly indicates that Mr. Woods was contacting someone whom he had just seen the day before at an industry event, which fatally undermines YA's claim that Mr. Woods could have only have gotten the McLarens executive's contact information through Mr. Lombardo. The second e-mail, sent to a claim manager from the Cincinnati Insurance Company, does allude to Mr. Murray. (*See* Cincinnati E-Mail at 2.) However, that e-mail was sent on January 31, 2018, more than eight months after Mr. Murray ended his relationship with YA and thus more than two months after the restrictive non-compete period ended. (*See* Emme Decl. ¶ 24.) The third e-mail was an October 9, 2018 e-mail to a Crawford & Company adjuster that contained an invitation to a cocktail hour that DND was hosting in conjunction with a conference. (Ex. FF (Crawford E-Mail) to YA Opp. to DND Mot. for Summ. J. [Doc. # 111-32] at 1.) The e-mail has no obvious probative value, as it

In sum, Counts Two and Four fail as a matter of law.

### III. Conclusion

For the foregoing reasons, YA's Motion for Summary Judgment [Doc. # 99] and Mr. Lombardo and DND's Motion for Summary Judgment [Doc. # 97] are each GRANTED in their entirety. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 11th day of June 2020.

---

makes no reference to any of the Consultants, was sent following the expiration of the Consultants' six-month non-compete period, and makes explicit reference to Mr. Woods's independent relationship with this invitation's recipient, (*see id.* ("I hope you are well. It's been a[w]hile.")).